(C.D. 2152)

APPROVED EQUIPMENT MFG. CO., INC. } *v.* UNITED STATES
TRANS WORLD SHIPPING CORP.

United States Customs Court, Second Division

(Decided February 17, 1960)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Alfred A. Taylor* and
*Richard E. FitzGibbon,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This case presents for determination the question of whether certain imported merchandise consists of flax yarns, as classified by the collector of customs at the port of New York, or flax rovings, as claimed by the importer. Single yarns of flax, not finer than 60 lea, are provided for in paragraph 1004(a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, at the rate of 25 per centum ad valorem. Flax roving is made dutiable at the rate of 10 per centum ad valorem by the provisions of paragraph 1002 of said act, as modified by said trade agreement.

The instant merchandise was invoiced as 1.25 lea flax line roving containing 1.90 turns per inch, but it appears from the report of the official Government chemist, which has not been challenged (defendant's exhibit F) that the flax in issue is 1.36 lea, having an average of 1.6 turns per inch, and an average breaking strength of 64 pounds. It is also not disputed in this case that the term "lea" is a unit of

measurement of the thickness of flax yarns based upon the standard that 300 yards to the pound equals 1 lea. As the number of yards per pound increases, the lea factor proportionately rises and, hence, 2 lea is a description of flax yarns having 600 yards to the pound. Thus, the instant merchandise, analyzed as 1.36 lea, runs approximately 408 yards to the pound.

Evidence that the term "line" relates to flax having a long fiber is likewise uncontroverted. Neither is there disagreement as to the ultimate use of the imported product, it appearing that, in its condition as imported, and as represented by plaintiffs' exhibit 1, the material is used as filling or weft in the weaving of unlined linen fire hose, pieces of which are in evidence as plaintiffs' collective exhibit 3. The material which constitutes the warp threads of fire hose is identified in the record as plaintiffs' exhibit 2, and described as a 6½-lea 3-ply flax yarn.

By deposition taken pursuant to commission, and introduced into evidence as plaintiffs' collective exhibit 5, W. J. Webster, the managing director of the foreign manufacturer, who was shown to have 35 years of experience in spinning and weaving flax, described the manufacturing and processing operations involved in the production of the imported merchandise. Briefly stated, these include *hackling* or combing out of the flax fibers into slivers; *doubling* or combining the resulting slivers and drawing them out to insure uniformity; *drawing* or further doubling and attenuating the slivers (the original sliver is doubled about 5,000 times in four drawing processes); and *roving*, in which the sliver is further drawn on a roving frame and twisted or rolled sufficiently so as to prevent fiber slippage. Thereafter, the material is boiled and bleached and, in that condition, exported.

Samples of the flax in each of the foregoing stages, to wit, hackled, doubled, drawn, in the roving, and boiled and bleached, were supplied as exhibits 1, 2, 3, 4, and 5, respectively.

Deponent further stated that, in the manufacture of flax yarns, the roving is drawn out on a spinning frame and twisted to provide tensile strength and to eliminate fiber slippage. When questioned as to whether the flax roving prior to boiling and bleaching could be further processed into flax yarn, the witness replied:

Yes. Roving as supplied can be manufactured into flax yarn in the normal spinning process. This is a sample of yarn spun from the unboiled flax roving already mentioned. The resultant size of this yarn is 12 lea spun with 6.90 turns per inch. This might be described as a fifth stage in the ordinary process of turning hackled flax line into yarn. (Exhibit 6.)

At the conclusion of his deposition, this witness supplied the following gratuitous statement:

Rove is essentially a sliver of fibres to which some twist has been imparted on a roving frame and which can be further attenuated by drafting on a spin-

ning frame. Yarn is the strong, highly twisted product which is obtained by drafting the rove on a spinning frame. The fundamental difference is that the twist in the rove, depending on the length of fibres in the rove, must be long enough to allow slippage of the fibres during drafting on a spinning frame. The twist in the yarn, however, has to be high enough to prevent slippage of the fibres and so give the necessary strength to the yarn. In other words, a rove can be drafted on a spinning frame whereas the yarn can not be so drafted.

Robert H. Jacobs, president of the Approved Equipment Manufacturing Co., Inc., the importer herein, also testified for plaintiffs. He expressed the view, predicated upon 10 to 12 years of experience in purchasing merchandise similar to exhibit 1, that it was a roving rather than a yarn, since it did not possess either the twist or the fineness of a yarn. He further stated that it is used as the filler in fire hose, because it has much better absorptive qualities than plied yarn, and that, whereas fire hose could be made entirely out of plied yarn, although lacking in absorption, it could not be woven exclusively of material like exhibit 1, as that material is too coarse, and the hose would fall apart.

Plaintiffs' witness Edward H. Ellis testified that he has worked in textiles all of his life. He is presently head of the yarn department of the Iselin-Jefferson Co., a division of the Dan River Mills, which company merchandises yarns produced by its own mills and sells on a commission basis for other manufacturers of yarn. Among the mills for which it sells is Stevens Linen Associates of Webster, Mass., and it appears that this witness has frequently observed the manufacture of flax yarns in that plant. He defined a flax yarn as essentially the product of a spinning frame, reasonably fine in size and having sufficient twist in it to be used as the warp or filling in linen fabrics; a flax roving as the product of a roving frame which is coarser and heavier, and has a softer twist. Within those definitions, and based upon a casual examination, he described plaintiffs' exhibit 1 as a roving and plaintiffs' exhibit 2, as a 3-ply yarn.

To the knowledge of Mr. Ellis, the only two direct uses for "flax roving" are as the filler in fire hose, and as the warp in a very heavy type of linen drapery. Otherwise, and generally, it is spun into yarn on a spinning frame. When asked whether material such as plaintiffs' exhibit 1 could be spun, he stated that he thought it might, but could not be sure without actually testing it on a spinning frame. In any event, he did not believe that the fact that the material had been boiled and bleached would affect its ability to be spun, although he did acknowledge that flax roving destined for the spinning frame is not normally so treated, "Because it is more economical to finish a yarn and then boil and bleach it."

Testifying for the defendant, in addition to the United States chemist who made the analysis of the subject merchandise and described the tests upon which his conclusions were based, were Robert

J. Gray, flax spinning mill superintendent of Stevens Linen Associates, Hugh W. Crawford, president and general manager of Stevens Linen Associates, and William R. Cooke, manager of Barbour Mills Flax Spinning Linen Thread Co. Each of these witnesses was well versed on the subject of the processing of textile fibers, particularly flax, having had many years of experience in that field.

By virtue of a background of 30 years of superintending mills producing flax yarns, and 5 years of experience with the manufacture of material like exhibit 1, witness Gray described the imported merchandise as the filling or weft yarns used in the weaving of linen fire hose. This material, he stated, is completely finished on the roving frame, except for the subsequent processes of boiling and winding. In his opinion, based upon his years of experience in producing flax yarns, it can not be further spun.

In response to questioning by the court, Gray testified that although both roving and spinning are processes of twisting and drawing, there is a clear line of distinction between a twisted fiber which is a yarn and a twisted fiber which is a roving. "The fiber from the roving frame, in order to be spun further, needs to have a very low strength. It only has sufficient strength to pull it off the bobbin on which it is wound." A roving of the size of plaintiffs' exhibit 1 would contain about a half turn of twist. Exhibit 1 differs from a roving in that it possesses yarn twist, which imparts maximum strength to the fibers. It is, however, produced on a roving frame. It can be woven and even used in knitting, but it can not be further spun.

This witness submitted nine samples of flax material which he identified as follows:

Defendant's exhibit B—flax roving produced on a roving frame and intended for spinning into yarn, possessing just enough twist to enable it to be pulled from the rove bob and drawn into a finer material in the rollers of the spinning frame.

Defendant's exhibit C—a roving having a little too much twist in it, which is, therefore, difficult to spin.

Defendant's collective exhibit D—seven skeins of flax yarns all produced on a roving frame which could not be spun because they contain too much twist. In explanation of the relationship of twist to spinning, Gray stated:

Rove with the proper amount of twist in it enters the retaining rollers of the spinning frame and goes from that to the drawing rollers which have a much greater surface speed than the retaining rollers. Now, if the rove has too much twist the drawing rollers cannot draw it. There can be no spinning take place.

Gray further testified that while some of the skeins in defendant's collective exhibit D may be too strong to be spun, since they have lost their maximum strength through overtwisting, they are not

strong enough to be considered as yarn. He prepared a graph, which was received in evidence as defendant's exhibit E, indicating the rove twist in turns per inch and the relative tensile strength in pounds. Commenting thereon, he stated, "Between 1.6 and 1.9 turns per inch the yarn has the greatest strength. After that, after 1.9 turns per inch the strength of the yarn decreases upon further twisting."

On cross-examination, Gray agreed that the characteristic of roving is its ability to be further drawn or attenuated by being placed on a spinning frame, and admitted that, if plaintiffs' exhibit 1 could be spun, he would consider it to be a roving. However, he did not believe that it could be spun. He further testified that the degree of twist in yarn of different sizes is compared in terms of twist factor which, in the case of normal dry spun yarn, is usually between 1.7 and 2. When that figure is multiplied by the square root of the lea, the yarn twist is determined. But even if the twist factor is less than 1.7, the yarn may be too strong to be spun.

Defendant's witness Crawford was also of opinion that plaintiffs' exhibit 1 was a yarn, produced on a roving frame. He made the following distinction between rovings and yarn:

Well, my conception of a roving is a strand of fibers that have a small amount of twist imparted in them that are wound loosely onto a bobbin which is then put onto a spinning frame for further reduction in size to a yarn. Whereas a yarn is a finished product which cannot be reduced any further in size. A yarn has a certain amount of breaking strength characteristics, whereas a roving is not necessarily considered a product with a definite amount of breaking strength.

He, too, agreed that the characteristic of a roving is its ability to be further drawn or attenuated on a spinning frame, and that if it were possible to further attenuate exhibit 1, he would consider it to be a roving. However, and notwithstanding the samples annexed to collective exhibit 5, he did not believe that it was either practicable or commercially possible to put exhibit 1, or exhibits 4 and 5 of collective exhibit 5, on a spinning frame, because they are finished yarns on the basis of their twist and breaking strength.

He further testified that plaintiffs' exhibit 1 is ready for fabrication into textile products; that it would not be economical to put more than a slight amount of twist into a roving which is to be spun; and that when the sliver is introduced into the roving frame, it is determined whether a roving or a roving yarn will be produced.

Similar and corroborating testimony was given by defendant's witness Cooke, who had, for 38 years, been employed by a firm engaged in the manufacture of yarns of linen, jute, cotton, and synthetic fibers. He stated, without reservation, that plaintiffs' exhibit 1 is a yarn produced on a roving frame, and used as the weft or filler in the weaving of fire hose. Like the other witnesses for defendant,

Cooke agreed that a roving is essentially something that can be spun, and if the imported merchandise could be spun into a usable yarn, he would consider it to be a roving. As he phrased it, "I could put any kind of roving with any type of twist over a spinning frame but it would not be an acceptable yarn." It might become a hard yarn or a very uneven yarn which would not be acceptable as a commercial yarn. He further expressed the opinion that exhibit 5 of plaintiffs' collective exhibit 5 was an acceptable yarn, and stated that he did not know of any mill in the United States which would put exhibits 4 and 5 of plaintiffs' collective exhibit 5 on a spinning frame.

To aid us in the determination of the issue posed in this case, counsel for plaintiffs have submitted for our consideration the following definitions of the competing terms, as found in Webster's New International Dictionary:

roving. *n.* 1. The operation of forming the rove, or slightly twisted sliver or roll of wool or cotton, flax, or similar fiber, by means of a machine for the purpose, called a roving frame or machine; also, a rove.

yarn. Spun, but otherwise unfinished, wool, flax, silk, cotton, etc.; spun and, often, blended filaments, as used in weaving to form the warp and filling * * *.

In the light of the highly technical knowledge actually required to distinguish between flax rovings and flax yarns, and the inability of the average layman to make a categorical determination of just what constitutes a "slightly twisted sliver," we do not find these definitions to be sufficiently specific. Accordingly, and to a large extent, our conclusions herein must rest upon the record. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 C.C.P.A. (Customs) 88, C.A.D. 735 (suit 4996, decided January 6, 1960).

Counsel for the plaintiffs assert that the subject merchandise consists of rovings rather than yarns, for the reason that the record shows that the material can be spun. Since defendant's witnesses all agreed that the basic characteristic of a roving is its ability to be further attenuated on a spinning frame, and since both Gray and Crawford conceded that they would consider plaintiffs' exhibit 1 to be a roving if it could be spun, plaintiffs urge that the fact of actual spinning of material in that condition conclusively establishes it to be a roving.

It is further argued that applying the formula for determining the degree of twist in the instant fibers, of the twist factor of normal dry spun yarn times the square root of the lea, establishes that they are susceptible of further spinning without exceeding maximum tensile strength.

We think, however, that these arguments on the part of plaintiffs tend to overemphasize facts which, though pertinent, are, nevertheless, subordinate to proof of far greater significance. It must be remembered that defendant's technical witnesses, all of whom are and

have been for many years actually engaged in the commercial production of flax rovings and yarns in this country, were unshaken in their convictions that merchandise in the condition of plaintiffs' exhibit 1 could not be further attenuated by being drawn through a spinning frame. We do not construe their testimony in this regard as a complete negation of the physical possibility of spinning the involved material, but rather as an affirmation of the commercial impracticability of spinning any flax fibers twisted to the extent of 1.6 turns per inch on the roving frame. To quote further from the testimony of Crawford:

* * * The idea of a roving frame is to prepare fibers in the most economical fashion possible so that they can be spun and reduced down to a size on a spinning frame. Now, the economical way to run a roving frame and the only way it is possible to run it in spinning flax yarns is to run the fiber with very slight twist. That is the economical way to run it. Now, when we make a yarn on the roving frame we have to add more twist than you would for a roving. And that is a finished yarn on the roving frame.

Moreover, it has not been established that the spun yarn produced by the manufacturer from material like plaintiffs' exhibit 1 prior to boiling and bleaching is an acceptable commercial yarn, or that it is sufficiently soft and even to be utilized in the weaving of linen fabrics. To be sure, Webster stated that such material could be spun in normal spinning operations. However, he also stated that in the roving process the flax slivers were twisted or rolled sufficiently to prevent slippage. Yet, in explaining the fundamental difference between roving and yarn, he observed that "the twist in the rove, depending on the length of fibres in the rove, must be long enough to allow slippage of the fibres during drafting on a spinning form. The twist in the yarn, however, has to be high enough to prevent slippage of the fibres and so give the necessary strength to the yarn." It is difficult to perceive how, within this latter statement, a roving yarn twisted sufficiently to prevent fiber slippage can, at the same time, be a roving permitting slippage of the fibers during drafting.

The actual fact is that merchandise of the type here involved is not ordinarily further drafted. Nor is it produced for that purpose. It is used in its condition as imported in a process of weaving as the weft or filler threads in the fabrication of linen fire hose, which tends to characterize it as a yarn, rather than as a roving, within the definitions hereinabove quoted.

Two early decisions of our predecessor, the Board of General Appraisers, would seem to have a bearing upon the question here at issue. The first of these, to wit, *Stephenson & Co.* v. *United States*, T.D. 16574, G.A. 3270, decided in 1895, involved certain woolen material, classified as yarn in paragraph 280 of the Tariff Act of 1894 and claimed to be roving within paragraph 279 of said act. Upon a record which established that although the material was the product

of a roving frame, it was not designed to be further attenuated, could not be spun, and was used for knitting sweaters, for the manufacture of upholstery fringes and for other purposes, the court held the material to be yarns, stating:

Within certain limits, the finer the yarns desired the finer the stock and the more extended the manipulation required to produce them. The coarse yarns, from number ten downward, are often designated as roving yarns, because a sufficient degree of drawing or attenuation and twisting can be given to rovings on frames specially set or adapted to the purpose. Thus it happens that such coarse yarns are sometimes called "rovings," yarn being understood. Singles twisted so hard that they could not be further drawn out would never be accepted as a good delivery of rovings, but would be as yarns.

The merchandise in question is a finished product adapted to be used for knitting, braiding, or weaving and can not be further drawn or spun.

The later case of *F. B. Vandegrift & Co.* v. *United States*, 31 Treas. Dec. 178, T.D. 36675, also involved wool strands, classified as yarns and claimed to be rovings, within paragraphs 287 and 286, respectively, of the Tariff Act of 1913. It there appeared that the material could not be used for knitting, as it would tend to become tangled and stop the machines; that it would be accepted as a good delivery for a roving, and could be spun. Based upon the distinctions drawn in the *Stephenson Co.* case, *supra*, and upon the weight of the evidence, the court held the merchandise to be more specifically provided for as rovings than as yarns.

Since the material at bar possesses sufficient twist and tensile strength to be adapted for use in weaving, and is ordinarily devoted to that end, and since it does not appear from the instant record that it is of a texture usually run through spinning frames, if indeed it is commercially practical to do so, we have no hesitation in holding it to be properly classifiable within the provisions of paragraph 1004 (a), as modified, *supra*, for single yarns of flax, not finer than 60 lea. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.